Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| DK INTERNATIONAL GROUP CORP. D/B/A AMERICANLITE<br><br>*Recurrido*<br><br>v.<br><br>LEDVANCE LLC Y OTROS<br><br>*Peticionario* | TA2026CE00658 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2024CV04480<br><br>Sobre: Libelo, Calumnia o Difamación |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

## RESOLUCIÓN

En San Juan, Puerto Rico, a 30 de junio de 2026.

Comparece ante nos Ledvance LLC (Ledvance), José Pesquera Pesquera (señor Pesquera) y Solange Cordero Velasco (señora Cordero Velasco) (en conjunto, peticionarios) mediante recurso de *Certiorari* y solicitan que revoquemos la *Resolución*[1] emitida el 12 de marzo de 2026[2] por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI o foro recurrido). Mediante el referido dictamen, el TPI declaró *No Ha Lugar* la *Moción de Sentencia Sumaria*[3] presentada por los peticionarios.

Por los fundamentos que expondremos a continuación, **denegamos** la expedición del recurso de *Certiorari*.

## I.

El caso de autos tuvo su génesis el 30 de julio de 2024, cuando DK International Corp. d/b/a Americanlite (Americanlite o recurrida) instó una *Demanda*[4] sobre difamación, daños y perjuicios en contra de los peticionarios. Allí la recurrida alegó que ciertas

---

[1] Apéndice 83 del recurso de *Certiorari*.
[2] Notificada el 13 de marzo de 2026.
[3] Apéndice 66 del recurso de *Certiorari*.
[4] Apéndice 1 del recurso de *Certiorari*.

comunicaciones emitidas por los peticionarios contenían expresiones falsas y difamatorias sobre el desempeño de una luminaria de Americanlite. Por su parte, el 9 de octubre de 2024, los peticionarios presentaron una *Moción de Desestimación*[5]. En la misma, adujeron que las comunicaciones emitidas estaban sustentadas en información cierta y valida.

Evaluado el petitorio, el 6 de diciembre de 2024, el TPI emitió y notificó una Resolución[6] en la cual declaró *No Ha Lugar* la solicitud de los peticionarios. Esto, debido a que la desestimación era prematura y los argumentos de las partes requerían el inicio de un descubrimiento de prueba, particularmente, por tratarse de aspectos técnicos y especializados relacionados con la industria de iluminación. Así pues, el 20 de diciembre de 2024, los peticionarios sometieron su *Contestación a Demanda*[7].

Tras varios incidentes procesales, el 12 de diciembre de 2025, la recurrida presentó *Moción de Sentencia Sumaria*[8]. En ésta, argumentó que procedía dictar sentencia sumaria a su favor, debido a que no existía controversia material de hechos respecto a que los peticionarios difundieron un comunicado falso y difamatorio sobre uno de sus productos. Sostuvo que dicho comunicado tergiversó las especificaciones técnicas de la luminaria, fue emitido de forma negligente y con el propósito de desacreditar a un competidor, causándole daños reputacionales y económicos. Además, alegó que los peticionarios se negaron a retractarse pese a haber sido requerido, por lo que solicitaron una retracción formal y una indemnización por daños ascendente a ciento cuarenta y cuatro mil

---

[5] Apéndice 23 del recurso de *Certiorari*.
[6] Apéndice 32 del recurso de *Certiorari*.
[7] Apéndice 33 del recurso de *Certiorari*.
[8] Apéndice 65 del recurso de *Certiorari*.

cuatrocientos ochenta y ocho dólares con cuarenta y dos centavos ($144,488.42)[9].

Ese mismo día, los peticionarios sometieron una *Moción de Sentencia Sumaria* y esgrimieron que las comunicaciones impugnadas no fueron falsas ni difamatorias, pues se limitaron a divulgar fielmente los resultados de una prueba independiente. Asimismo, arguyeron que actuaron de manera razonable y diligente al verificar la información antes de divulgarla; y que la recurrida no podía demostrar daños reales a su reputación, pérdida de clientes, ventas o negocios atribuibles a dichas comunicaciones. Por ello, sostuvieron que faltaban elementos esenciales para las causas de acción de libelo y daños y perjuicios[10].

Así las cosas, las partes presentaron sus respectivas oposiciones[11]. Analizadas las mismas, el 12 de marzo de 2026[12], el foro recurrido emitió una *Resolución* en la cual realizó los siguientes hechos incontrovertidos y controvertidos:

### HECHOS INCONTROVERTIDOS

1) Americanlite es una corporación organizada bajo las leyes del Estado de Florida cuya dirección física y postal es 2450 Hollywood Blvd. Suite #703, Hollywood, FL, 33020.

2) Americanlite se dedica a la manufactura y comercialización de luminarias LED.

3) Americanlite distribuye sus productos en Puerto Rico a través de LDA Incorporado ("LDA"), su representante de

---

[9] La moción estuvo acompañada de la siguiente evidencia: Deposición del señor Fabian Kleyman, Product Overview SPX3 Series, Deposición del señor José Pesquera Pesquera, Carta del 29 de abril de 2024, Correos Electrónicos, Ledvance, LLC Test Report, Americanlite Test Report, Deposición de la señora Melanie Brittain, LM-79-08 Test Report for Americanlite, Deposición de la señora Solange M. Cordero Velasco, Deposición del señor Sergio J. Pérez Costas, Contestación y Objeciones a Primer Pliego Interrogatorios y Requerimiento de Producción de Documentos, Invoice, Carta de McConnell Valdés al señor Pesquera y DesignLights Consortium.

[10] La moción estuvo acompañada de la siguiente evidencia: Deposición del señor Fabian Kleyman, Deposición del señor Luis Burgos Márquez, Deposición de la señora Solange M. Cordero Velasco, Deposición del señor José Pesquera Pesquera, Deposición del señor Sergio J. Pérez Costas, Deposición de la señora Melanie Brittain, Product Overview SPX3 Series, Correos Electrónicos, Project Proposal, Ledvance, LLC Test Report, Carta del 29 de abril de 2024 y Contestación y Objeciones a Primer Pliego Interrogatorios y Requerimiento de Producción de Documentos.

[11] Véase, Anejos 73 y 74 del recurso de *Certiorari*. Ambas oposiciones fueron presentadas el 16 de enero de 2026.

[12] Notificada el 13 de marzo de 2026.

ventas, con quien tiene una relación comercial desde aproximadamente el 2011.

4) El producto de Americanlite (i.e. la luminaria modelo LED SPX3) es comercilizado por la parte demandante y el mismo se lanzó al mercado en el 2022.

5) El Producto de Americanlite es un Sports Light que se utiliza en áreas deportivas, en grandes superficies, en patios, y contenedores, entre otros.

6) La hoja de especificaciones del Producto de Americanlite dispone que el flujo lumínico del mismo es de hasta 160 Lm/W ("up to").

7) La hoja de especificaciones dispone que el Producto de Americanlite es DLC listed premium y contempla un nivel de tolerancia de 10% respecto a los lúmenes que emite.

8) Ello implica que el valor actual puede fluctuar un 10%.

9) Ledvance es una entidad que se dedica a la manufactura y venta de luminarias.

10) El señor Pesquera es el gerente de operaciones de Ledvance en Puerto Rico.

11) La señora Cordero fue representante de ventas de Ledvance desde el 2018 y hasta aproximadamente mayo de 2025, cuando fue transferida a otro puesto. Para el tiempo en que fungía como representante de ventas, la señora Cordero se reportaba al señor Pesquera.

12) Como parte de sus funciones, el señor Pesquera supervisa a cinco (5) empleados de Ledvance en Puerto Rico, incluyendo al señor Pérez (representante de ventas), el Sr. Jose Luis Blanco (representante de ventas), la Sra. Diana Caraballo (representante de servicio al cliente), la Sra. Iris Vega (gerente de almacén), y el Sr. Antonio Martínez (empleado de almacén).

13) Los clientes directos e indirectos de Ledvance en Puerto Rico están compuestos por distribuidores y diseñadores eléctricos. Estos son profesionales que realizan el diseño de iluminación de proyectos nuevos o remodelaciones y determinan los productos que se van a utilizar.

14) Ledvance tiene alrededor de setenta (70) clientes en Puerto Rico.

15) Ledvance vende productos en Puerto Rico que compiten con los de Americanlite.

16) Típicamente, Ledvance no hace comparaciones de sus productos con los de sus competidores.

17) El 29 de abril de 2024, Ledvance suscribió y difundió el comunicado que, en lo aquí pertinente, expresa que los resultados de una prueba llevada a cabo por Intertek "confirman que el flujo lumínico [del Producto de Americanlite] [es] diferente a lo publicado en su hoja de especificaciones (80,000 lm/160 lm/W)".

18) El comunicado fue redactado por el señor Pesquera y lleva su firma.

19) El Comunicado fue enviado por Ledvance a sesenta (60) de sus clientes en Puerto Rico.

20) Las personas encargadas de difundir el Comunicado son la señora Cordero y el señor Pérez, ambos representantes de ventas de Ledvance y responsables por manejar las cuentas de clientes en Puerto Rico.

21) Entre los clientes de Ledvance a quienes se les envió el comunicado también se encuentran clientes de Americanlite.

22) El comunicado también fue enviado a varios diseñadores eléctricos.

23) El lenguaje al final del comunicado que lee "en Ledvance mantenemos nuestro compromiso de ofrecerles productos de iluminación de la mejor calidad en los que siempre puede confiar", se hizo con el propósito de reforzar la calidad y confiabilidad de los productos de Ledvance.

24) El producto de Americanlite que se menciona en el comunicado compite directamente con la luminaria de Ledvance # 62933.

25) Previo a difundir el comunicado, Ledvance estaba perdiendo ordenes frente al Producto de Americanlite.

26) Como resultado de la pérdida de órdenes, Ledvance decidió encomendar la prueba objeto del comunicado.

27) Las pérdidas de ventas frente al producto de Americanlite llevaron a Ledvance a emitir el comunicado.

28) Al difundir el comunicado, la señora Cordero sostuvo que el flujo lumínico del producto de Americanlite no coincidía con su hoja de especificaciones.

29) La idea de redactar y difundir el comunicado fue del señor Pesquera.

30) Ledvance nunca ha visto el Producto de Americanlite en funcionamiento.

31) Ledvance reconoce que una posibilidad para la pérdida de ventas de Ledvance a Americanlite es que Americanlite tenía un producto de mejor precio.

32) La hoja de especificaciones producto de Americanlite dispone que el flujo lumínico del Producto de Americanlite es de hasta ("up to") 160LxW.

33) Ledvance admitió que la condición de up to implica que se trata de un máximo, pero que el flujo lumínico puede ser menor.

34) El rol de Intertek al llevar a cabo pruebas sobre productos luminarios es uno de carácter neutral, independientemente de quién sea el cliente.

35) Intertek no emite opiniones.

36) El reporte de Intertek comisionado por Ledvance no incluye ninguna conclusión sobre si el producto de Americanlite cumple o no con la hoja de especificaciones.

37) La conclusión en el comunicado, a los fines de que el producto de Americanlite es diferente a la hoja de especificaciones, es de Ledvance, no Intertek.

38) Intertek no hizo una comparación entre los resultados de su prueba y la hoja de especificaciones del producto de Americanlite.

39) Previo a difundir el comunicado, Ledvance no consultó el contenido de este con Intertek.

40) A pesar de que el comunicado hace referencia a un reporte de Intertek y a la hoja de especificaciones del producto de Americanlite, Ledvance no anejó de dichos documentos al referido comunicado, y tampoco consideró relevante hacerlo.

41) La hoja de especificaciones del producto de Americanlite contiene una serie de condiciones, incluyendo una disposición que aclara que el flujo lumínico del mismo es de hasta ("up to") 160LxW.

42) Es decir, el flujo lumínico máximo del Producto de Americanlite es 160LxW.

43) Ledvance no tomó en consideración el lenguaje de hasta ("up to") 160LxW al preparar el comunicado y tampoco incluyó referencia al mismo.

44) El señor Pérez, quien difundió el comunicado, no revisó la hoja de especificaciones del producto de Americanlite previo enviar el referido comunicado.

45) El señor Pérez tampoco leyó el reporte de Intertek antes de difundir el comunicado, a pesar de que el comunicado se basa en los alegados resultados de dicho reporte.

46) Al obtener el ejemplar del producto de Americanlite para enviarlo a Intertek para fines de su reporte, Ledvance no verificó su estado o condición. De hecho, ni tan siguiera abrió la caja del ejemplar.

47) Previo a enviar el Comunicado, nadie en Ledvance leyó el manual de instrucciones del producto de Americanlite.

48) Ledvance admitió de forma hipotética que, si una de sus luminarias obtuviese un resultado inconsistente con su hoja de especificaciones, esta hubiera solicitado una segunda prueba para validar dichos resultados.

49) Antes de enviar el comunicado, Ledvance no consideró hacer una segunda prueba sobre el Producto de Americanlite.

50) Ello, a pesar de estar sorprendido con los resultados.

51) El 12 de junio de 2024, previo al inicio del caso de autos, Americanlite le envió a Ledvance y al señor Pesquera una carta solicitando el cese y desista de las expresiones falsas y difamatorias en torno al producto de Americanlite, que se retractasen formalmente de las mismas, y que se abstuvieran de publicar expresiones futuras sobre el particular.

52) Americanlite le concedió a Ledvance un término de 10 días para responder a la referida carta y acceder a los

remedios allí solicitados, con una reserva expresa de derechos en caso de éstos no acceder.

53) DK International Group Corp. opera comercialmente bajo el nombre "Americanlite", el cual es un D/B/A ("doing business as").

54) Americanlite es la marca comercial de una de las líneas de productos de DK Int.

55) Los productos identificados bajo la marca Americanlite no son fabricados por DK Int., sino por terceros en China.

56) DK Int. vende productos Americanlite en los Estados Unidos, aunque no maneja específicamente la distribución en dicho mercado.

57) LDA es una empresa dedicada a actuar como representante de fábrica para productos relacionados al mercado eléctrico en Puerto Rico.

58) LDA es el representante de ventas y distribuidor exclusivo de Americanlite en Puerto Rico.

59) Como representante de Americanlite, el rol de LDA incluye mercadear y vender los productos Americanlite en el mercado puertorriqueño.

60) Ledvance es una compañía con presencia global y oficinas alrededor del mundo que se dedica a la venta, manufactura, diseño y mercadeo de productos de iluminación, incluyendo bombillas, balastros, lámparas y luminarias.

61) La operación de Ledvance en Puerto Rico consiste en una oficina de ventas y un almacén local ubicado en Cataño.

62) La manufactura y diseño de los productos de Ledvance se realiza fuera de Puerto Rico.

63) Los clientes de Ledvance en Puerto Rico consisten principalmente en distribuidores eléctricos a quienes Ledvance vende sus productos, así como diseñadores eléctricos que especifican luminarias para proyectos.

64) Los distribuidores eléctricos venden los productos de Ledvance directamente al consumidor final.

65) La señora Cordero comenzó a trabajar en Ledvance en o alrededor del año 2018 como 'luminaire sales specialist'.

66) Mientras ocupó la posición de 'luminaire sales specialist', la señora Cordero tenía asignadas cuentas de clientes en Puerto Rico y sus funciones principales incluían atender a dichos clientes y asistirlos en asuntos de precios y disponibilidad de productos y ofrecer apoyo técnico para proyectos.

67) La señora Cordero desempeñó el cargo de 'luminaire sales specialist' hasta el 1 de mayo de 2025 cuando paso a formar parte de un equipo de Ledvance en Estados Unidos llamado 'project team'.

68) El señor Pesquera comenzó a trabajar en Ledvance en el 2007 como ingeniero comercial.

69) En el 2015, el señor Pesquera pasó a ocupar su posición actual de gerente de operación, a cargo de las ventas, del almacén local y de las oficinas de ventas y operaciones de Ledvance en Puerto Rico.

70) El señor Pérez comenzó a trabajar en Ledvance en septiembre de 2018 como representante de ventas, cargo que continúa ocupando al presente.

71) Como representante de ventas, el señor Pérez forma parte del equipo de ventas de Ledvance en Puerto Rico y atiende el mercado de Puerto Rico a través de distribuidores autorizados de Ledvance.

72) Intertek es un laboratorio que realiza pruebas de desempeño a productos comerciales y residenciales.

73) Intertek tiene políticas internas para prohibir conflictos de interés y garantizar que el laboratorio se limite estrictamente a medir y reportar los resultados.

74) La señora Brittain ha trabajado en Intertek por aproximadamente catorce (14) años y labora en el área de pruebas de iluminación del laboratorio de Cortland.

75) Actualmente, la señora Brittain ocupa el puesto de 'Senior Associate Engineer', cargo que ha desempeñado desde alrededor del año 2020.

76) Como 'Senior Associate Engineer', la señora Brittain realiza pruebas de desempeño para distintos programas de eficiencia y cumplimiento, incluyendo Energy Star, Design Lights Consortium ("DLC") y el Department of Energy ("DOE"), en productos de iluminación.

77) Entre las responsabilidades principales de la señora Brittain se encuentran: revisar la información técnica del producto, asesorar al cliente sobre el tipo de prueba solicitada, coordinar con los técnicos de laboratorio la ejecución de la prueba, revisar los datos recopilados y emitir los resultados al cliente.

78) El producto que es objeto de este litigio es una luminaria LED marca Americanlite tipo sport light identificada como modelo AL575144.

79) La luminaria pertenece a la línea SPX3 Series, que consiste en luminarias tipo 'sport light' destinadas para uso en canchas deportivas, áreas recreativas, puertos, patios industriales, muelles, fachadas y otras superficies de gran escala.

80) La línea de productos SPX3 utiliza una sola ficha técnica, la cual contiene todos los modelos que componen dicha serie, incluyendo la luminaria.

81) La ficha técnica establece en su sección superior izquierda que la línea de productos SPX3 ofrece una eficiencia de "up to 160 LxW".

82) La letra "W" se refiere al wattage o potencia, mientras que la letra "L" corresponde a la referencia de lúmenes dentro de la expresión "LxW".

83) El término lumen se refiere a la cantidad de luz efectiva que puede emitir una luminaria, lo que también se conoce como flujo lumínico.

84) La ficha técnica expresa que los valores de lúmenes están sujetos a una tolerancia lumínica de hasta 10% ("Lumen Tolerance up to 10%").

85) Una prueba de "benchmarking" consiste en que un fabricante somete un producto de un competidor para verificar el desempeño y evaluar la veracidad de sus representaciones de mercadeo.

86) El procedimiento técnico de una prueba de benchmarking es idéntico al de cualquier otra prueba de rendimiento (performance testing).

87) Como parte del formato estándar de Intertek, reportes de pruebas de benchmarking no incluyen el número de modelo ni fotografías del producto evaluado.

88) El 17 de abril de 2024, la Sra. Catherine (Cathy) Emerling (señora Emerling), de Ledvance, contactó por correo electrónico al Sr. Luis Perdomo (señor Perdomo), representante de ventas de Intertek, para solicitar una prueba de "benchmarking" del modelo Americanlite SPX3 AL575144, es decir, la luminaria.

89) El 18 de abril de 2024, el señor Perdomo transmitió a la señora Emerling la cotización identificada como 'Quote No. QU-01445650-1', que incluye el 'Project Proposal' o propuesta.

90) Tanto la cotización como la propuesta identifica el "Scope of Work" como "AL575144 Benchmark Testing".

91) El "Project Name" de la propuesta también identifica "AL575144 Benchmark Testing".

92) La prueba se realizaría conforme al método ANSI/IES LM-79 (LM-79), utilizado para medir el flujo lumínico de productos de iluminación y reportar su desempeño.

93) El método LM-79 es el estándar típicamente utilizado para medir el flujo lumínico (lumen output) y la eficiencia.

94) Una vez Ledvance aceptó la propuesta, la señora Brittain fue asignada para realizar la prueba de benchmarking.

95) Una vez el señor Pérez obtuvo la muestra, la llevó directamente al almacén de Ledvance y la entregó al equipo de almacén y operaciones, quienes se encargaron del envío y documentación correspondiente.

96) La propuesta exigía la entrega por parte de Ledvance de (1) una muestra completamente operacional del producto a ser evaluado; (2) manuales e instrucciones de operación y (2) completar el 'Product Information Packet'.

97) La señora Brittain confirmó que Ledvance cumplió con dichos requisitos, a saber, que entregó una muestra de la luminaria totalmente operacional, proveyó las instrucciones de operación y sometió el formulario 'Product Information Packet'.

98) La señora Brittain confirmó, además, que recibió la muestra enviada por Ledvance y que ésta aparentaba ser una unidad nueva en su empaque original.

99) Dentro del empaque recibido de la muestra se encontraba la luminaria y una visera.

100) Ledvance no proveyó instrucciones de ensamblaje relativas a la muestra.

101) El 26 de abril de 2024, Intertek completó la prueba "benchmark" solicitada por Ledvance y emitió el "Test Report" (el reporte).

102) El reporte corresponde a la misma prueba solicitada por Ledvance e identificada previamente en la cotización y en la propuesta.

103) Aunque el reporte usa la designación "Model-1", el producto probado fue la luminaria Americanlite SPX3, modelo AL575144, es decir, la luminaria.

104) El reporte fue preparado por la señora Brittain y revisado internamente por el 'Technical Lead' de la división de iluminación de Intertek, Jeff Davis.

105) La omisión del número del modelo o del nombre de la marca no afecta la validez ni los resultados del reporte.

106) El equipo utilizado estaba debidamente calibrado según las fechas indicadas en la última página del reporte.

107) La señora Brittain confirmó que el reporte refleja exactamente la prueba realizada, que todos los datos concuerdan con sus observaciones y que no se realizaron modificaciones, correcciones o ediciones al resultado original.

108) La señora Brittain afirmó que el reporte es completo, preciso y refleja fielmente el desempeño de la muestra y que sostiene la exactitud de todos los resultados reportados.

109) La Carta expresa lo siguiente:
"Estimado Distribuidor Autorizado de LEDVANCE,

El 26 de abril de 2024 se realizó una prueba de referencia ("benchmark test") de la siguiente luminaria:

Marca: Americanlite
Modelo: SPX3™ Series AL575144 (500W Sports Light)

Los resultados de la prueba confirman que el flujo lumínico de este modelo de la luminaria Americanlite SPX3™ Series es 66,880 lúmenes (132 lm/W) diferente a lo publicado en su hoja de especificaciones (80,000 lm/160 lm/W). […]"

110) La Carta afirma además que:
"La prueba de referencia fue realizada por el laboratorio independiente de Intertek en Cortland, NY bajo los siguientes estándares:ANSI/IES LM 79-19: Optical and Electrical Measurements of Solid State Lighting Products IES LM-79-08: Electrical and Photometric Measurements of Solid State Lighting ANSI NEMA ANSLG C78.377: 2017: Specifications for the Chromaticity of Solid-State Lighting (SSL) Products. […]"

111) La carta fue distribuida mediante correos electrónicos por la señora Cordero y el señor Pérez a los clientes de Ledvance.

112) Los Correos expresan el siguiente lenguaje uniformemente:

"Luego que varios clientes nos trajeran la inquietud de la diferencia en lumens de nuestra Sports Light de 500W versus la de Americanlite (serie SPX3), enviamos una luminaria a hacerle pruebas en un laboratorio independiente. La prueba de laboratorio confirmó que los lumens de la SPX3 de 500W de Americanlite son 66,880 lumens, lo cual no coincide con el valor que sale en su literatura (80,000 lumens). Adjunto el comunicado oficial de LEDVANCE con la información para su referencia."

113) La señora Brittain confirmó que la visera tiene un impacto significativo sobre el flujo lumínico y la eficacia.

114) Americanlite confía en el peritaje de Intertek[13]. (Énfasis provisto).

### HECHOS CONTROVERTIDOS

1) Si las expresiones publicadas por Ledvance en su comunicado son falsas o difamatorias.

2) Si las expresiones publicadas por Ledvance en su comunicado se realizaron de manera negligente y las mismas provocaron el supuesto daño.

3) Si Ledvance comisionó otros reportes o pruebas técnicas sobre las luminarias de la competencia.

4) Si el lenguaje de la hoja de especificaciones aplica a toda la línea SPX3 o si solamente al producto objeto de la demanda.

5) Si los diseñadores eléctricos a los que se le envió el comunicado objeto de la reclamación eran o no clientes de Ledvance.

6) ¿Cuál era la opinión específica de los clientes de Ledvance en cuanto al rendimiento del producto de Americanlite, si la misma constituía una certificación de dicho rendimiento o calidad del producto y si dicho producto alcanzaba los niveles de lúmenes y eficacia publicados?

7) Las razones por las cuales Ledvance dejó de despachar o perdió órdenes de la luminaria núm. 62933 y si esto fue a consecuencia del alegado buen rendimiento o calidad del producto de Americanlite.

8) ¿Cuáles fueron las razones, además de la pérdida de órdenes, por las cuales Ledvance decidió encomendar la prueba objeto del comunicado?

9) Si la calidad del producto de Americanlite fue un factor para la pérdida de ventas por parte de Ledvance.

10) Si la hoja de especificaciones del producto de Americanlite realmente garantiza un flujo lumínico de 160Lm/W.

---

[13] Apéndice 83 del recurso de *Certiorari*, págs. 18-28.

11) Si el producto de Americanlite cumple con lo expuesto en su hoja de especificaciones.

12) Si el comunicado de Ledvance se refería en general a todos los ejemplares del producto de Americanlite y si el mismo tenía la intención de que el lector concluyera que tal producto no cumple con su hoja de especificaciones.

13) La forma y manera, así como el método y las condiciones en que Intertek, DesignLights Consortium y UTEST realizaron sus pruebas en torno al producto de Americanlite así como la certeza y confiabilidad de las mismas.

14) Si en el comunicado emitido por Ledvance se tomó en cuenta el nivel de tolerancia de 10% del producto, el lenguaje de "up to" 160Lm/W y cualquier información relevante establecida en la hoja de especificaciones.

15) Si Ledvance al momento de comisionar la prueba sometió a Intertek el manual de instrucciones referente al producto de Americanlite.

16) Si al momento de emitirse el comunicado, Ledvance consideró poner algún tipo de advertencia sobre posibles errores en cuanto al reporte de Intertek.

17) Si el visor del producto de Americanlite es una parte integral y obligatoria del mismo.

18) Si la ficha técnica del producto de Americanlite expresa que el mismo es una parte accesoria.

19) ¿Cuáles son las cualificaciones y características técnicas del producto de Americanlite y si las mismas concuerdan con la ficha técnica, así como su hoja de especificaciones?

20) Si la ficha técnica del producto de Americanlite advierte con suficiencia y de manera correcta al consumidor sobre los niveles de flujo que emite el producto.

21) ¿Cómo el señor Pérez obtuvo la muestra del producto de Americanlite para la prueba de Intertek y quien le proveyó dicha muestra?

22) El estado y las condiciones de la muestra del producto de Americanlite al momento de que Intertek realizara las pruebas.

23) Si ocurrió alguna irregularidad o lectura inesperada en las pruebas realizadas al producto de Americanlite.

24) Si antes de publicar el comunicado, Ledvance realizó los análisis pertinentes sobre los resultados de la prueba de Intertek, la data sobre flujo lumínico, los lúmenes por watt y las discrepancias observadas.

25) Si antes de autorizar la divulgación del comunicado, los representantes de Ledvance cotejaron el mismo y lo compararon con las pruebas realizadas por Intertek, así como la ficha técnica del producto de Americanlite.

26) Si el señor Pesquera tuvo participación en la distribución del comunicado de Ledvance mediante correo electrónico.

27) Si el resultado de la prueba realizada por Intertek al producto de Americanlite la cual fue comisionada por

Ledvance es representativo del rendimiento y calidad de todos los ejemplares o modelos de dicho producto respecto al resultado de dicha prueba.

28) Si Americanlite ha recibido quejas de sus clientes en relación al comunicado de Ledvance.

29) La responsabilidad de la parte demandada, si alguna.

30) El presunto daño a Americanlite, su monto y si el mismo fue causado por las expresiones del comunicado de Ledvance, si alguno[14]. (Énfasis provisto).

En vista de lo anterior, el TPI declaró *No Ha Lugar* las mociones de sentencia sumaria presentadas por las partes.

Inconformes con el dictamen, las partes presentaron mociones de reconsideración y sus respectivas oposiciones[15]. Evaluados los petitorios, el 21 de abril de 2026[16], el TPI emitió dos *Resoluciones Interlocutorias*[17] en las cuales declaró *No Ha Lugar* las mociones de reconsideración de las partes.

Insatisfechos aun, el 22 de mayo de 2026, los peticionarios acudieron ante este foro intermedio y le imputaron al foro recurrido la comisión de los siguientes señalamientos de error:

PRIMERO: ERRÓ EL TPI AL DECLARAR NO HA LUGAR LA MOCIÓN DE SENTENCIA SUMARIA DE LEDVANCE, A PESAR DE QUE AMERICANLITE NO CUENTA CON PRUEBA SUFICIENTE PARA ESTABLECER ELEMENTOS ESENCIALES DE SUS RECLAMACIONES, PARTICULARMENTE FALSEDAD Y DAÑOS REALES Y REPUTACIONALES.

SEGUNDO: ERRÓ EL TPI AL RECHAZAR U OMITIR HECHOS MATERIALES PROPUESTOS POR LEDVANCE QUE DEBÍAN TENERSE POR INCONTROVERTIDOS, TODA VEZ QUE AMERICANLITE NO LOS CONTROVIRTIÓ CON REFERENCIA A PRUEBA ADMISIBLE NI DE FORMA SUFICIENTE.

TERCERO: ERRÓ EL TPI AL CONCLUIR QUE EXISTÍAN CONTROVERSIAS DE HECHOS MATERIALES QUE IMPEDÍAN LA ADJUDICACIÓN SUMARIA, AÚN CUANDO LAS CONTROVERSIAS IDENTIFICADAS SON COLATERALES, INMATERIALES O INSUFICIENTES PARA ALTERAR LA DISPOSICIÓN DEL CASO BAJO EL DERECHO APLICABLE.

CUARTO: ERRÓ EL TPI AL DECLARAR NO HA LUGAR LA MOCIÓN DE RECONSIDERACIÓN DE LEDVANCE SIN CORREGIR LOS ERRORES DE DERECHO SEÑALADOS RESPECTO A LA APLICACIÓN DE LA REGLA 36, LA

---

[14] *Íd.*, págs. 28-31.
[15] Véase, Anejos 84 y 86 del recurso de *Certiorari*.
[16] Notificadas el 22 de abril de 2026.
[17] Véase, Anejos 92 y 93 del recurso de *Certiorari*.

INSUFICIENCIA DE PRUEBA SOBRE FALSEDAD Y DAÑOS, Y LA MATERIALIDAD DE LAS CONTROVERSIAS IDENTIFICADAS.

El 26 de mayo de 2026[18], emitimos una *Resolución* en la cual le concedimos a Americanlite diez (10) días contados a partir de la notificación de esta para que mostrara causa por la cual no se debía expedir el recurso presentado. En cumplimiento con lo anterior, el 8 de junio de 2026, la recurrida sometió su *Oposición a Expedición de Recurso de Certiorari*. Allí argumentó que el TPI actuó correctamente al denegar la sentencia sumaria porque existían controversias genuinas de hechos materiales sobre los elementos esenciales de su reclamación por difamación. Sostuvo que el comunicado difundido por Ledvance fue falso al presentar erróneamente los resultados de una prueba de Intertek y al sugerir que el producto de Americanlite incumplía con sus especificaciones, cuando ni la hoja técnica ni el informe de Intertek sustentaban esa conclusión. Además, alegó que subsisten controversias sobre la confiabilidad de la prueba realizada por Intertek.

Asimismo, la recurrida sostuvo que sí presentó evidencia suficiente de daños, tanto reputacionales como por mitigación, y que la jurisprudencia no exigía demostrar pérdidas económicas específicas para sostener una acción de difamación. Añadió que el récord demostraba que el comunicado fue ampliamente difundido, provocó reacciones de terceros y obligó a Americanlite a incurrir en gastos y esfuerzos para contrarrestar sus efectos. Por ello, argumentó que los planteamientos de los peticionarios pretendían resolver controversias fácticas que correspondían al juicio en su fondo.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

---

[18] Notificada el 27 de mayo de 2026.

## II.

### -A-

El auto de *certiorari* es un recurso procesal discrecional y extraordinario mediante el cual un tribunal de mayor jerarquía puede rectificar errores jurídicos en el ámbito de la Regla 52.1 de Procedimiento Civil[19] y conforme a los criterios que dispone la Regla 40 del Reglamento del Tribunal de Apelaciones[20]. Nuestro ordenamiento judicial ha establecido que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto[21]. Esta norma de deferencia también aplica a las decisiones discrecionales de los tribunales de instancia. En cuanto a este particular, el Tribunal Supremo de Puerto Rico ha expresado lo siguiente:

> No hemos de interferir con los tribunales de instancia en el ejercicio de sus facultades discrecionales, excepto en aquellas situaciones en que se demuestre que este último (1) actuó con prejuicio o parcialidad, (2) incurrió en un craso abuso de discreción, o (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo[22].

En ausencia de tal abuso o de acción prejuiciada, error o parcialidad, no corresponde intervenir con las determinaciones del Tribunal de Primera Instancia[23]. No obstante, la Regla 52.1 de Procedimiento Civil, *supra*, faculta nuestra intervención en situaciones determinadas por la norma procesal. En específico establece que:

> [...] El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá

---

[19] 32 LPRA Ap. V, R. 52.1.
[20] Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 141 pág. 63, 216 DPR __ (2025).
[21] *Coop. Seguros Múltiples de P.R. v. Lugo,* 136 DPR 203, 208 (1994).
[22] *Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000).
[23] *García v. Padró,* 165 DPR 324, 334-335 (2005*); Zorniak Air Servs. v. Cessna Aircraft Co.,* 132 DPR 170, 180 (1992).

revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión[24].

[...]

En armonía con lo anterior, la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra*, para dirigir la activación de nuestra jurisdicción discrecional en estos recursos dispone que para expedir un auto de *certiorari*, este Tribunal debe tomar en consideración los siguientes criterios:

A. Si el remedio y la disposición de la decisión recurrida a diferencia de sus fundamentos, son contrarios a derecho.

B. Si la situación de hechos planteada es la más indicada para el análisis del problema.

C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

E. Si la etapa del procedimiento en que se encuentra el caso es la más propicia para su consideración.

F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Por lo tanto, un *certiorari* solo habrá de expedirse si al menos uno de estos criterios aconseja la revisión del dictamen recurrido. Es decir, el ordenamiento impone que ejerzamos nuestra discreción y evaluemos si, a la luz de alguno de los criterios contenidos en la misma, se requiere nuestra intervención.

---

[24] 32 LPRA Ap. V, R. 52.1.

**-B-**

El mecanismo procesal de la sentencia sumaria surge de la Regla 36 de Procedimiento Civil[25]. Por medio de este mecanismo, una parte puede solicitar que el tribunal que dicte sentencia sumaria de la totalidad de la reclamación o de parte de esta[26]. Sin embargo, la sentencia sumaria solo está disponible para la disposición de aquellos casos que sean claros; cuando el tribunal tenga ante sí la verdad de todos los hechos esenciales alegados en la demanda; y que solo reste por disponer las controversias de derecho existentes[27].

Por su parte, el promovente de una sentencia sumaria deberá establecer, mediante declaraciones juradas o con prueba admisible en evidencia, que no existe controversia real respecto a hechos materiales de la controversia[28]. Por hechos materiales se entienden aquellos que pueden afectar el resultado de una reclamación de acuerdo con el derecho sustantivo[29].

En contraste, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real por lo cual cualquier duda es insuficiente para derrotar una solicitud de sentencia sumaria[30]. En efecto, la duda debe ser tal que permita concluir que existe una controversia real y sustancial sobre los hechos materiales[31]. De esta manera, la parte promovida debe puntualizar los hechos propuestos que pretende controvertir, haciendo referencia a la prueba específica que sostiene su posición[32]. Es decir, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega

---

[25] 32 LPRA Ap. V, R. 36.
[26] *Vera v. Dr. Bravo*, 161 DPR 308, 332 (2004).
[27] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911-912 (1994).
[28] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 110 (2015).
[29] *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).
[30] *Meléndez González et al. v. M. Cuebas, supra*, pág. 110.
[31] *Íd.*
[32] *León Torres v. Rivera Lebrón,* 204 DPR 20, 44 (2020).

están en disputa"[33]. No puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa[34].

Entretanto, la Regla 36.3 de Procedimiento Civil establece el procedimiento para la consideración de la moción de sentencia sumaria, así como el contenido de la moción y de la contestación de la parte promovida[35]. Respecto a la moción solicitando que se dicte una sentencia sumaria, la Regla 36.3 (a) de Procedimiento Civil dispone que la misma tiene que desglosar lo siguiente:

> (1) una exposición breve de las alegaciones de las partes;
> (2) los asuntos litigiosos o en controversia;
> (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;
> (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;
> (5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y
> (6) el remedio que debe ser concedido[36].

Por otra parte, la Regla 36.3 (b) de Procedimiento Civil dispone que la contestación a la moción de sentencia sumaria debe contener, además de los sub incisos (1), (2) y (3) del inciso (a): una relación de los hechos esenciales y pertinentes que están en controversia, con referencia a los párrafos enumerados por la parte promovente y con indicación de la prueba en la que se establecen esos hechos; una enumeración de los hechos que no están en controversia; y las razones por las cuales no se debe dictar la sentencia, argumentando el derecho aplicable[37]. Asimismo, cuando se presente una solicitud de sentencia sumaria conforme a la Regla 36 de Procedimiento Civil,

---

[33] *Íd.,* pág. 44.
[34] *Ramos Pérez v. Univisión, supra,* págs. 215-216.
[35] 32 LPRA Ap. V, R. 36.3.
[36] 32 LPRA Ap. V, R. 36.3 (a).
[37] 32 LPRA Ap. V, R. 36.3 (b).

*supra,* "la parte contraria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra si procede"[38].

Igualmente, la Regla 36.3 de Procedimiento Civil[39], dispone que:

[…]

(e) La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que como cuestión de derecho el tribunal debe dictar sentencia sumaria a favor de la parte promovente.

[…]

Como mencionamos anteriormente, la parte promovente de una solicitud de sentencia sumaria está obligada a establecer, mediante prueba admisible en evidencia, la inexistencia de una controversia real respecto a los hechos materiales y esenciales de la acción. Además, deberá demostrar que, a la luz del derecho sustantivo, amerita que se dicte sentencia a su favor[40]. Para que tal sea el resultado, viene llamado a desglosar, en párrafos numerados, los hechos respecto a los cuales aduce que no existe disputa alguna. Una vez expuestos, debe especificar la página o párrafo de la declaración jurada u otra prueba admisible que sirven de apoyo a su contención[41]. **Cuando de las propias alegaciones, admisiones o declaraciones juradas, surge una controversia bonafide de hechos, la moción de sentencia sumaria resulta ser improcedente. Ante ello, el tribunal competente debe**

---

[38] 32 LPRA Ap. V, R. 36.3 (c).
[39] 32 LPRA Ap. V, R. 36.3 (e).
[40] *Rodríguez García v. UCA*, 200 DPR 929 (2018), Ramos Pérez v Univisión, 178 DPR 200 (2010), *Sucn. Maldonado v. Sucn. Maldonado,* 166 DPR 154, (2005); *Vera v Dr. Bravo, supra.*
[41] 32 LPRA Ap. V, R. 36.3 (a)(4); *Roldán Flores v. M. Cuebas, et al.*, 199 DPR 664, (2018); *SLG Zapata-Rivera v. J.F.,* 189 DPR 95 (2013).

**abstenerse de dictar sentencia sumaria en el caso y cualquier duda en su ánimo, lo debe llevar a resolver en contra de dicha solicitud**[42].

El Tribunal Supremo de Puerto Rico ha expresado en varias ocasiones que la sentencia sumaria es un remedio extraordinario y discrecional que solo se debe conceder cuando no existe una controversia genuina de hechos materiales y lo que resta es aplicar el derecho[43]. En términos generales, al dictar sentencia sumaria, el tribunal deberá hacer lo siguiente:

> (1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal;
>
> (2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos[44].

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando: "(1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) **surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial**, o (4) como cuestión de derecho, no proceda"[45]. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho[46].

Por tratarse de un remedio discrecional, el uso del mecanismo de sentencia sumaria tiene que ser mesurado y solo procederá cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos[47]. De tal manera, solo procede dictar sentencia sumaria cuando surge claramente que el promovido

---

[42] *Vera v Dr. Bravo, supra*; *Mgmt. Adm. Servs., Corp. v. ELA*, 152 DPR 599 (2000).
[43] *Maldonado v. Cruz*, 161 DPR 1, 39 (2004).
[44] *Vera v. Dr. Bravo, supra*, 334.
[45] *Íd.*, págs. 333-334; *Acevedo Arocho v. Depto. Hacienda y otros*, 212 DPR 335, 336 (2023).
[46] *Maldonado v. Cruz, supra*, pág. 39.
[47] *Vera v. Dr. Bravo, supra*, pág. 334.

por la moción no puede prevalecer bajo ningún supuesto de hechos y que el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia[48]. Cuando no existe una clara certeza sobre todos los hechos de la controversia, no procede una sentencia sumaria[49]. Cualquier duda sobre la existencia de una controversia sobre los hechos materiales, debe resolverse contra la parte promovente[50]. Toda inferencia que se haga a base de los hechos y documentos que obren en los autos, debe tomarse desde el punto de vista más favorable al que se opone a la solicitud de sentencia sumaria[51]. Así pues, tomando en consideración que la sentencia sumaria es un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley"[52].

Es importante mencionar que, este Tribunal utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una moción de sentencia sumaria[53]. Por consiguiente, los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

(1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil y la jurisprudencia le exigen al foro primario;

(2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36;

(3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

(4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el

---

[48] *Nieves Díaz v. González Massas*, 178 DPR 820, 848 (2010).
[49] *Metrop. de Préstamos v. López de Victoria*, 141 DPR 844 (1996).
[50] *Rosario v. Nationwide Mutual*, 158 DPR 775, 780 (2003) citando a *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 DPR 563, 575 (1997).
[51] *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 DPR 599, 610- 611 (2000).
[52] *Roig Com. Bank v. Rosario Cirino*, 126 DPR 613, 617 (1990).
[53] *Vera v. Dr. Bravo, supra*, pág. 334.

Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[54].

Finalmente, y como norma general, si la moción procede en derecho, el tribunal debe dictar la sentencia sumaria "a favor del promovente si la parte contraria no responde de forma detallada y específica a una solicitud debidamente formulada"[55]. Si el Tribunal de Primera Instancia considera que no procede dictar sentencia sumaria en el caso que tiene ante sí, o que no procede conceder ese remedio en su totalidad, es obligatorio que cumpla con lo expuesto en la Regla 36.4 de las de Procedimiento Civil[56], la cual dispone que:

> Si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, ni se concede todo el remedio solicitado o se deniega la misma, y es necesario celebrar juicio, **será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, y hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando los procedimientos ulteriores que sean justos en el pleito, incluso una vista evidenciaria limitada a los asuntos en controversia.** Al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad. (Énfasis nuestro).

En conclusión, es menester consignar los hechos que, a juicio del TPI, están en controversia y aquellos que no lo están para entender cuáles son los hechos que impiden que se dicte la sentencia sumaria en su totalidad.

**-C-**

Atinente al caso de autos, junto a la sentencia sumaria tradicional, existe una modalidad de solicitud de sentencia sumaria aplicable cuando el promovente alega que su adversario no cuenta con evidencia suficiente para prevalecer en el juicio. La llamada sentencia sumaria por insuficiencia de prueba fue reconocida por el Tribunal Supremo en *Medina v. M.S. & D. Química P.R., Inc.*[57]. Según

---

[54] *Roldan Flores v. M Cuebas*, 199 DPR 664, 679 (2018).
[55] *SLG Zapata-Rivera v. J. F. Montalvo*, 189 DPR 414, 432 (2013).
[56] 32 LPRA Ap. V, R. 36.4.
[57] 135 DPR 716 (1994).

esta decisión, después de que las partes hayan realizado un adecuado y apropiado descubrimiento de prueba, el promovente puede presentar una moción de sentencia sumaria en la que alegue que su adversario no cuenta con evidencia suficiente para, al menos, probar un elemento esencial e indispensable de su reclamación[58].

Advertimos, sin embargo, que la jurisprudencia citada requiere que el promovente de la moción de sentencia sumaria por insuficiencia de prueba alegue y demuestre todos los elementos requeridos para que prevalezca una moción de sentencia sumaria "tradicional", más el elemento adicional de insuficiencia de la prueba. Esto se debe a que "[a] la modalidad de sentencia sumaria por insuficiencia de la prueba le aplican todas las normas y principios que tradicionalmente hemos indicado deben utilizarse por los tribunales al entender en una moción de sentencia sumaria"[59]. Si existiera duda sobre si hay prueba suficiente o no en torno a alguna controversia de hecho relevante, los tribunales deben denegar la solicitud de sentencia sumaria por ese fundamento[60].

El promovente de una moción de sentencia sumaria por insuficiencia de prueba no puede descansar solo en una simple alegación de que el demandante no tiene evidencia suficiente para probar su caso. Es decir, **tiene que demostrar que se ha llevado a cabo un descubrimiento de prueba completo, adecuado y apropiado. Ello significa que tiene que presentarle al tribunal suficientes elementos de juicio para poder evaluar la adecuacidad del descubrimiento realizado**[61]. No se considerará adecuado el descubrimiento de prueba cuando de un análisis de los documentos se refleja que la parte promovente ha dejado de

---

[58] *Íd.*, pág. 732.
[59] *Íd.*, pág. 734.
[60] *Íd.*
[61] *Íd.*, pág. 733.

auscultar alguna información que le pudiera haber conducido a obtener alguna prueba admisible[62].

Además, debe persuadir al juzgador de que: (1) no es necesario celebrar una vista evidenciaria o el juicio en su fondo; (2) el demandante no cuenta con suficiente evidencia para probar al menos un hecho esencial de su reclamación, y (3) procede la desestimación de la reclamación como cuestión de derecho[63]. Si la parte promovente, luego de haber transcurrido un tiempo adecuado y razonable para el descubrimiento de prueba, puede demostrar que del récord del tribunal surge que la parte promovida no cuenta con evidencia suficiente para probar un elemento esencial de su caso sobre la cual tiene el peso de la prueba, procede que se dicte sentencia sumaria para desestimar la demanda[64].

Por su parte, para poder derrotar una moción de sentencia sumaria bajo la modalidad de la insuficiencia de prueba el promovido puede: (1) presentar una oposición conteniendo prueba admisible en evidencia, o prueba que pueda convertirse en admisible, o que dé lugar a prueba admisible, que demuestre la existencia de evidencia para probar los elementos esenciales de su caso; (2) alegar que hay prueba en el récord que puede convertirse en admisible que derrotaría la contención de insuficiencia; (3) exponer que la moción es prematura porque el descubrimiento es inadecuado, está a medias o no se ha realizado; o, (4) que el caso, por su naturaleza, no es uno conveniente para que se resuelva por el mecanismo de sentencia sumaria[65].

Sostiene el tratadista Echavarría Vargas que, "la solicitud de sentencia sumaria por insuficiencia de prueba solo debe prosperar en aquellas ocasiones en las cuales no exista ninguna prueba. No es

---

[62] *Íd.*
[63] *Íd.*, págs. 733-34.
[64] *Íd.*
[65] *Íd.*, pág. 734.

un asunto de credibilidad o de fuerza de la prueba, sino de inexistencia de evidencia"[66].

## III.

Previo a atender la controversia ante nos, es importante mencionar que conforme a la Regla 52.1 de las de Procedimiento Civil, *supra*, este Tribunal tiene jurisdicción para atender el presente recurso, toda vez que es una *Resolución* de carácter dispositivo. Sin embargo, y a pesar de que este es susceptible de revisión, de conformidad con la Regla 52.1 de las de Procedimiento Civil, *supra*, determinamos denegar su expedición.

Luego de evaluar la totalidad del expediente y la bien fundamentada *Resolución* del TPI, a la luz de los criterios de la Regla 40 del Tribunal de Apelaciones, *supra*, no identificamos razón por la cual este Foro deba intervenir con el dictamen recurrido. Ello, ya que no se configura ninguna de las situaciones que allí se contemplan. Recordemos que nuestro ordenamiento jurídico nos brinda la discreción de intervenir en aquellos dictámenes interlocutorios en los que el TPI haya sido arbitrario, cometido un craso abuso de discreción o cuando, de la actuación del foro, surja un error en la interpretación o la aplicación de cualquier norma procesal o de derecho sustantivo. Reiteramos que en el recurso que aquí atendemos no se nos ha demostrado que haya alguno de estos escenarios.

## IV.

Por los fundamentos que anteceden, ***denegamos*** el recurso de epígrafe.

Notifíquese.

---

[66] J. A. Echavarría Vargas, *Procedimiento Civil Puertorriqueño*, Colombia, 2012, pág. 221.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones